Bill R. MURRAY, Appellant,

v.

STATE of Alaska, Appellee.

No. A–1832.

Court of Appeals of Alaska.

March 17, 1989.

Sen K. Tan, Asst. Public Defender, and Dana Fabe, Public Defender, Anchorage, for appellant.

Cynthia M. Hora, Asst. Atty. Gen., Office of Special Prosecutions and Appeals, Anchorage, and Grace Berg Schaible, Atty. Gen., Juneau, for appellee.

Before BRYNER, C.J., and COATS and SINGLETON, JJ.

## OPINION

SINGLETON, Judge.

Bill R. Murray was convicted by a jury of two counts of sexual abuse of a minor in the first degree, an unclassified felony, in violation of AS 11.41.434(a)(1). Superior Court Judge Karl S. Johnstone, sentenced Murray to two consecutive thirty-year maximum terms, for a composite sixty-year sentence. *See* AS 12.55.125(i). Murray makes three arguments on appeal: (1) that the trial court erred in failing to dismiss the indictment; (2) that the trial court improperly instructed the jury that cunnilin-

gus does not require penetration; and (3) that the trial court imposed an excessive sentence. We affirm Murray's conviction, but remand his case for resentencing.

The state presented evidence of Murray's offenses to the grand jury on November 22, 1985. The prosecutor informed the grand jury that he did not intend to present testimony from the two children who were the alleged victims, but stated, "If you want to have them, you should make requests and I'll try to get them here, okay." The prosecutor called A.M., the father of one of the two victims, five-year-old S.M. The state also called Anchorage Police Officer Nancy Potter. Officer Potter was the investigating officer and had previously interviewed S.M. and the other victim, B.H., S.M.'s nine-year-old neighbor.

A.M. testified that Murray was his roommate for about one year. A.M. stated that he had found "soft-core" pornographic magazines beside A.M.'s bed on two occasions. On the first occasion, A.M. found the magazine beside his bed during the day. He questioned S.M. about the magazine, and his daughter told him that Murray had shown it to her. A.M. immediately asked Murray about the magazine, and Murray denied having shown it to S.M. A.M. testified that his daughter was "going through a fibbing stage," and that he therefore disregarded the first incident. After the second incident, however, A.M. hid the magazines under a dresser drawer.

The second incident occurred at night, after A.M. returned home from work. A.M. again found a magazine next to his bed, and this time the magazine was opened to show sexually explicit photographs. This time, A.M. was more concerned, and he questioned S.M. about other things Murray might have done. He asked S.M. if she had seen Murray naked, and she said, "yes." He asked her if Murray had touched her "down there" and she said, "yeah." When he asked her how Murray had touched her, she replied, "with his tongue." A.M. confronted Murray the next morning, and Murray denied any sexual contact with S.M. A.M. asked Murray to leave, and Murray left the next morning.

A.M. also noted behavioral changes in S.M. He testified that S.M. appeared scared to come home from school. A.M. surmised that S.M. was afraid because Murray had been babysitting her occasionally after school. He said that he had taught S.M. to "love everyone," and she told him that she did, except she did not love Murray.

A.M. also told the grand jury about a night when B.H. slept over at their house. He told them that B.H. woke him up and told him that Murray was drunk and was scaring them. He testified that he got up and made Murray go to bed. He testified that B.H. later told him and others, including Officer Potter, that Murray had licked her between the legs and on her breasts on that occasion.

Officer Potter testified that she had responded to a telephone complaint from A.M. and C.R., the mother of B.H., reporting that Murray had been sexually abusing their children. She interviewed B.H. for the first time on the night of the call. She testified that B.H. told her that on the night she slept over at A.M.'s house, she was awakened by Murray and that he had been licking her in the vaginal and breast areas. Potter testified that B.H. reported that Murray did this three separate times to her that evening, and that she witnessed him perform the same acts on S.M. Potter interviewed B.H. more extensively approximately one week later. During this interview, B.H. reported that Murray had also put his penis between her legs on the night she stayed at A.M.'s house. B.H. also reported a second incident during which Murray placed his penis between her legs. She also told Potter that during the first incident, Murray told her that he wanted to make love to her. B.H. indicated that she knew that making love referred to something adult men and women do, which children were not supposed to do. Potter testified that B.H. demonstrated an act of sexual intercourse with two dolls.

Potter first interviewed S.M. at the police station. S.M. described episodes of vaginal and anal penetration and fellatio occurring between April 1985 and October 1985.

S.M. was able to describe the events in detail, and spoke of a "milky substance" coming out of Murray's penis. Potter also testified that S.M. demonstrated, using anatomically correct dolls, what had occurred. She put the penis of the male doll between the legs of the female doll, in its mouth, and in its rectal area.

The grand jury returned an indictment for two counts of sexual abuse of a minor in the first degree. Murray moved to dismiss the indictment. The motion was denied and Murray was convicted at trial.

## DISCUSSION

Murray renews his objection to the indictment on appeal. Murray contends that pursuant to AS 12.40.110, the state was permitted to rely heavily on hearsay testimony before the grand jury to secure the indictment. Murray argues that AS 12.40.-110 is unconstitutional. In the alternative, he argues that, even if the statute is constitutional, the state failed to comply with its requirements.

Alaska Statute 12.40.110 provides:

(a) In a prosecution for an offense under AS 11.41.410–11.41.440 or 11.41.455; [sexual offenses involving children], hearsay evidence of a statement related to the offense, not otherwise admissible, made by a child who is the victim of the offense may be admitted into evidence before the grand jury if

(1) the circumstances of the statement indicate its reliability;

(2) the child is under 10 years of age when the hearsay evidence is sought to be admitted;

(3) additional evidence is introduced to corroborate the statement; and

(4) the child testifies at the grand jury proceeding or the child will be available to testify at trial.

(b) In this section "statement" means an oral or written assertion or nonverbal conduct if the nonverbal conduct is intended as an assertion.

The legislature adopted this section with the express intention of amending Alaska Rule of Criminal Procedure 6(r) which governs the admissibility of testimony at a grand jury proceeding.[1] *See* Ch. 41, § 2, SLA 1985.

First, we will consider Murray's constitutional argument. In Murray's view, permitting hearsay before a grand jury in cases of sexual assault on children violates three provisions of the Alaska Constitution. Specifically, Murray argues: (1) he was denied the right to a grand jury indictment, Alaska Const. art. 1, § 8; (2) he was denied the right to due process before the grand jury, Alaska Const. art. 1, § 7; and (3) he was denied the right to equal protection of the laws, Alaska Const. art. 1, § 1. Murray concedes that he did not make these constitutional challenges in the trial court, but contends that we should consider them for the first time on appeal as "plain error." Alaska R.Crim.P. 47(b). Both Murray and the state have carefully briefed these issues and they are pending in a number of other cases as well. Therefore, we will consider these constitutional issues.

■ We are satisfied that the statute is constitutional. Both the United States Supreme Court and the Alaska Supreme Court have held that an indictment may constitutionally be based entirely on hearsay testimony. *Costello v. United States*, 350 U.S. 359, 363–64, 76 S.Ct. 406, 409, 100 L.Ed. 397 (1956); *Taggard v. State*, 500 P.2d 238, 242 (Alaska 1972); *State v. Parks*, 437 P.2d 642, 644–45 (Alaska 1968). It is true that the Alaska Supreme Court, as a matter of common law, rather than constitutional law, initially required that either the reliability of a hearsay declarant must be established or the declarant's statements must be corroborated. *Taggard*, 500 P.2d at 242–43. However, AS

---

1. Criminal Rule 6(r) provides:

 *Admissibility of Evidence.* Evidence which would be legally admissible at trial shall be admissible before the grand jury. In appropriate cases, however, witnesses may be presented to summarize admissible evidence if the admissible evidence will be available at trial. Hearsay evidence shall not be presented to the grand jury absent compelling justification for its introduction. If hearsay evidence is presented to the grand jury, the reasons for its use shall be stated on the record.

12.40.110 addresses both these concerns. In a later case, *State v. Gieffels*, 554 P.2d 460 (Alaska 1976), the supreme court discussed the then recently enacted Criminal Rule 6(r), which added the requirement that "compelling justification" be shown before hearsay is presented. The court equated "compelling justification" with "necessity." *Id.* at 464–65. In most cases, necessity requires that the declarant be unavailable before hearsay can be used. It is this requirement which AS 12.40.110 deleted.

In our view, *Parks, Taggard,* and *Costello* establish that unrestricted use of hearsay before the grand jury does not deprive a defendant of due process or of the constitutional right to a grand jury review of the prosecution's evidence before the return of an indictment. *A fortiori,* a statute which permits hearsay only if it is reliable and corroborated does not offend our state constitution. The question of whether to require a finding that a hearsay declarant must be unavailable before his or her declarations may be presented to the grand jury is, in our view, one which the constitution leaves to the legislature.

■ We next address Murray's contention that the statutory classification which permits hearsay from child declarants to be presented to grand juries in sexual abuse cases, but implicitly rejects the use of hearsay in other cases involving crimes against children, violates equal protection. Murray relies upon *Griffith v. State*, 641 P.2d 228 (Alaska App.1982).

■ The Alaska Supreme Court has addressed our state constitution's equal protection clause in a number of carefully reasoned decisions. *See, e.g., Patrick v. Lynden Transport, Inc.*, 765 P.2d 1375 (Alaska 1988); *Alaska Pacific Assur. Co. v. Brown*, 687 P.2d 264, 269–74 (Alaska 1984) (citing and discussing other Alaska cases). It is unnecessary to repeat that entire discussion here. Essentially, the Alaska courts employ an "adjustable 'unform-balancing' test which place[s] a greater or lesser burden on the state to justify a classification depending on the importance of the individual right involved." *Brown*, 687 P.2d at 269. The reviewing court must consider a number of factors: (1) the nature of the interest impaired; (2) the purpose served by the challenged legislation; and (3) the state's interest in the particular means employed to further the state's goals. *Id.* It appears to be clear that a statute which survives an equal protection challenge under the more stringent Alaska state standards discussed in these cases will survive a challenge under the federal constitution as well. *See Patrick*, 765 P.2d at 1377. We are satisfied that the statute in question does not unconstitutionally discriminate against sex offenders.

Murray has not convinced us that he is entitled to the highest level of scrutiny. He has not argued that "sex offenders" are a class which would be considered a "suspect classification" under federal equal protection analysis. Nor has he convinced us that any infringed interest involved amounts to what would be called a "fundamental right" in the federal system, because, as discussed above, an indictment may constitutionally be based entirely on hearsay testimony. We are satisfied that a legitimate purpose is served by the legislation and that the means employed are carefully tailored to that goal and bear a fair and substantial relation to it. The legislature could properly conclude that testifying twice—once before the grand jury and once at trial—places a greater burden on child victims of sexual abuse than on child victims of other crimes.[2]

In summary, we hold that AS 12.40.110 is not unconstitutional for any of the reasons argued by Murray. Murray's rights to a grand jury indictment, to due process, and to equal protection under the state and federal constitutions were not violated.

---

**2.** Murray relies on Graham, *Indicia of Reliability and Face to Face Confrontation: Emerging Issues in Child Sexual Abuse Prosecutions,* 40 U.Miami L.Rev. 19, 83 n. 141 (1985) (reporting that a number of attorneys and psychologists at a conference on child sexual abuse unanimously agreed that a great majority of children are capable of testifying before fact finders without much difficulty).

 We next turn to Murray's alternative argument that the state failed to satisfy the requirements of AS 12.40.110. Murray concedes that both victims were under ten years of age at the time their statements were presented to the grand jury. Murray also concedes that the victims were available to testify at trial and, in fact, testified at trial. Nevertheless, he contends that two of the statutory requirements were not met: first, that the circumstances surrounding each statement indicate its reliability; and second, that there was additional evidence presented to the grand jury to corroborate each statement. Murray argues that the statute requires that both the corroborating evidence and evidence for determining reliability be presented to the grand jury. The state concedes that corroborating evidence must be presented to the grand jury. However, the state argues that the reliability of the child's statements may be determined at a subsequent hearing before the trial court. We agree with Murray that evidence of both the reliability of the statements and evidence corroborating the statements should be submitted to the grand jury. The Alaska Constitution entitles a defendant to a grand jury indictment. Alaska Const. art. 1, § 8. Therefore, the grand jury must be able to evaluate the weight and significance of the evidence presented against the defendant. See Gieffels, 554 P.2d at 465. Where that evidence consists of police officers repeating hearsay statements of children, the grand jury can only perform its function if it understands the circumstances under which those statements were made. The grand jury can then guage the reliability of the evidence and consider any corroborating evidence establishing the accuracy of the statements evaluated.

We will separately address the reliability prong and the corroboration prong of the test set forth in AS 12.40.110. See Contreras v. State, 718 P.2d 129, 139 (Alaska 1986) (establishing the importance of distinguishing between the reliability and the corroboration of hearsay statements).

The Alaska Supreme Court addressed an analogous, although admittedly different, issue in State v. Jones, 706 P.2d 317 (Alaska 1985). In that case, the supreme court held that if a warrant is based partly upon the hearsay statements of police informants to establish probable cause, then the magistrate must be furnished sufficient information, including the underlying circumstances, to independently determine: (1) the informant's basis of knowledge, and (2) the informant's credibility. Id. at 320 (discussing the two-prong test adopted by the United States Supreme Court in Aguilar v. Texas, 378 U.S. 108, 84 S.Ct. 1509, 12 L.Ed. 2d 723 (1964), and Spinelli v. United States, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed. 2d 637 (1969)). In this case, the grand jury clearly had sufficient information to enable it to conclude that the hearsay declarants, S.M. and B.H., had personal knowledge of the sexual assault.

As to the declarant's credibility or reliability, the Alaska Supreme Court has frequently noted the reliability of a victim's hearsay statements. In Metler v. State, 581 P.2d 669, 673 n. 6 (Alaska 1978), the court said:

Unlike hearsay declarants drawn from a criminal milieu, the [victims] were ordinary citizens and victims of an extortion attempt who were cooperating with the police out of concern for the public and for their own safety. Further, their hearsay statements were verified by the two extortion notes, one of which was delivered to the [victim's] residence while the police were on the premises. The reliability of such "citizen informants" need not be established prior to the admission of their hearsay declarations before the grand jury. See Erickson v. State, 507 P.2d 508, 517–18 (Alaska 1973).

In terms of reliability, there is no reason to differentiate between a child victim and an adult victim of crime. Furthermore, there is nothing in the circumstances surrounding the making of the statements that detracts from their reliability.

 In State v. Leavitt, 111 Wash.2d 66, 758 P.2d 982 (1988), the Washington Supreme Court addressed the question of the

reliability of a child hearsay declarant and offered the following observations:

> The factors for assessing reliability of child hearsay statements include " '(1) whether there is an apparent motive to lie; (2) the general character of the declarant; (3) whether more than one person heard the statements; (4) whether the statements were made spontaneously; and (5) the timing of the declaration and the relationship between the declarant and the witness.' ". Also to be considered are [these additional] factors ...: (1) whether the statement contained assertions about past fact—if not, it carries on its face a warning to the jury not to give the statement undue weight; (2) whether cross-examination could establish that the declarant was not in a position of personal knowledge to make the statement; (3) how likely it is that the statement was founded on faulty recollection; and (4) are the circumstances surrounding the making of the statement such that there is no reason to suppose that the declarant misrepresented the defendant's involvement, for example, was the statement spontaneous or against the declarant's penal interest?

758 P.2d at 986 (citing *Dutton v. Evans*, 400 U.S. 74, 91 S.Ct. 210, 27 L.Ed.2d 213 (1970); *State v. Ryan*, 103 Wash.2d 165, 691 P.2d 197 (1984); and *State v. Parris*, 98 Wash.2d 140, 654 P.2d 77 (1982)).

We agree that these factors are relevant and may be considered by the trial court in considering a motion to dismiss an indictment for noncompliance with AS 12.40.110. We stress, however, that the presence or absence of any particular one of the factors is not determinative, but that a consideration of all of them may be helpful in evaluating the reliability of a child's hearsay statements. *See also* Graham, *supra* n. 2 at 26–28, 53–57.

■ Under the first set of factors discussed in *Leavitt*, the statements of both children were sufficiently reliable. First,

Murray does not suggest that either child had any apparent motive to accuse him falsely. Rather, Murray suggests that the children were susceptible to pressure from the police officers who interviewed them. However, we find nothing in the record to support a finding that the police pressured the children. There is also no suggestion that either child had ever accused any other adult of sexual impropriety. Second, there are only two indications in the record regarding the children's general character. One is A.M.'s statement, which the grand jury heard, that S.M. had a problem with fibbing. The second indication was that there were some apparent inconsistencies between B.H.'s description of the abuse during her two separate interviews. These inconsistencies were also disclosed to the grand jury. Third, S.M.'s complaints were communicated to her father, to Officer Potter, and to another police investigator. S.M.'s statements to her father were made under circumstances which Murray concedes qualified as a first complaint admissible under *Greenway v. State*, 626 P.2d 1060 (Alaska 1980). Fourth, the girls' statements to the police were in response to questioning, as were S.M.'s statement to her father. Finally, there is nothing in the timing of the statements or the relationship between the declarants and the witnesses which casts doubt on the accuracy of the girls' statements. The officers were investigating allegations, not gathering evidence to support an already reached decision to prosecute.

Under the second set of factors discussed in *Leavitt*, the statements of the children were also sufficiently reliable. First, the girls' statements were assertions of past fact. Second, while cross-examination could possibly have shown inadequate knowledge, the evidence suggests that both the girls were speaking from personal knowledge. Further, claims of sexual abuse will virtually always involve past fact, and cross-examination is reserved for trial, not for grand jury proceedings.[3]

---

**3.** In *Gieffels,* the supreme court pointed out the desirability of grand jury cross-examination of witnesses as a justification for restricting hearsay. *Gieffels,* 554 P.2d at 465. We note that AS

12.40.110 changes Criminal Rule 6(r) (admissibility of evidence), but does not change Rule 6(q) (sufficiency of evidence). Criminal Rule 6(q) authorizes the grand jury to require the

Third, the statements were made in November of 1985, and described incidents occurring during the preceding summer and fall. Thus, it would not appear that the statements were the products of faulty recollection. Finally, as we have seen, there is nothing in the record to suggest any particular reasons why the children would misrepresent Murray's actions. We conclude that the circumstances surrounding the making of the statements were sufficiently detailed to enable the grand jury to make an independent evaluation of reliability.

■ The next question is whether the grand jury was presented with sufficient corroborating evidence. In *Bodine v. State*, 737 P.2d 1072, 1075 (Alaska App. 1987), we considered whether there was sufficient evidence to support a conviction for sexual abuse of a minor. In *Bodine*, the child victim had initially accused the defendant of sexual abuse, but then had recanted. In reaching our decision to affirm the conviction, we placed great emphasis on the child's ability to describe the sexual contact with specificity. Given the child's age (five years at the time of the assault), we concluded that the maturity and accuracy of the detail in her description of the offense provided intrinsic assurance of the reliability of her statement. *Id.* The same is true of both victims in Murray's case.

■ In addition, as noted above, the defense concedes that S.M.'s statements to her father would come in, independent of the statute, under *Greenway*, 626 P.2d 1060. Therefore, these statements would further corroborate the girls' charges. B.H. told the officers that she initially complained to A.M. that Murray was bothering her. A.M. corroborated this statement in part. In fact, A.M.'s testimony establishes that Murray was present and had the opportunity to molest the girls on a number of the occasions when the girls claimed they were molested. As we recently noted, one child's claims of sexual abuse may corroborate another child's claim against the same individual. *Clifton v. State*, 758 P.2d 1279, 1281–82 (Alaska App.1988). We recognize that Murray did not confess or make damaging admissions. We also recognize that there was no admissible medical or physical evidence which corroborated the girls' statements.[4] Nevertheless, we are of the view that there was sufficient evidence to corroborate the statements and to permit a grand jury to return an indictment in this case. *See also* Graham, *supra* n. 2, at 58–61.

■ Murray's second argument on appeal is that the court erred in instructing the jury that "cunnilingus" and "fellatio" do not require penetration of or by any organ, and that mere contact between the mouth and the genitals is sufficient. Murray was charged under AS 11.41.434(a)(1) which provides:

(a) An offender commits the crime of sexual abuse of a minor in the first degree if

(1) being 16 years of age or older, the offender engages in sexual penetration with a person who is under 13 years of age or aids, induces, causes, or encourages a person who is under 13 years of age to engage in sexual penetration with another person[.]

Alaska Statute 11.81.900(a)(53)(A) defines sexual penetration to mean:

Genital intercourse, cunnilingus, fellatio, anal intercourse, or an intrusion, however slight, of an object or any part of a person's body into the genital or anal opening of another person's body.

In its jury instructions, the trial court set out the statutory definition, and then added

child's presence if it is concerned about the accuracy of the hearsay declarations. The grand jury was told in this case that it could summon the children if it wished to question them. It appears that no such request was made.

**4.** The state relied primarily on certain medical reports to corroborate S.M.'s testimony before the grand jury. The trial court held that these reports were inadmissible hearsay, and the state does not contest that ruling on appeal. We therefore have not relied upon the medical evidence for corroboration under the statute.

the following language of which Murray complains:

"Cunnilingus" and "fellatio" do not require penetration of or by any organ. These sexual acts only require contact between the mouth and the genitals, including the outer genitals in the female.

The terms "cunnilingus" and "fellatio" are not defined in the statute. In the absence of a statutory definition, we normally look to the dictionary to determine the meaning of terms in common usage. AS 01.10.040; *Walker v. State*, 742 P.2d 790, 791 (Alaska App.1987). Webster's defines "cunnilingus" as "a sexual activity involving oral contact with the female genitals." Webster's New World Dictionary 346 (2d College ed. 1980). "Fellatio" is defined as "a sexual activity involving oral contact with the male genitals." *Id.* at 513. These dictionary definitions do not require that the mouth or tongue penetrate into the vagina or that the penis be placed into the mouth. A number of jurisdictions having similar statutes have therefore concluded that these offenses do not require actual penetration. *See People v. Sommerville*, 100 Mich.App. 470, 299 N.W.2d 387, 390–91 (1980); *State v. Ludlum*, 303 N.C. 666, 281 S.E.2d 159, 162–63 (1981). *See also Carter v. State*, 122 Ga.App. 21, 176 S.E.2d 238, 240 (1970); *State v. Fraction*, 206 N.J.Super. 532, 503 A.2d 336, 337–38 (App.1985); *State v. Orona*, 97 N.M. 232, 638 P.2d 1077, 1079–80 (1982). We agree with these authorities. The jury instruction which stated that cunnilingus and fellatio do not require an intrusion into the genitals was therefore a correct statement of the law. The trial court did not err in giving the instruction.

Murray's final argument is that the sentence imposed was excessive.[5] Murray is a forty-one-year-old Alaskan native, who was born in a remote village. He joined the Navy when he was eighteen years of age after completing the tenth grade. He was honorably discharged and returned to Alaska where he has since remained. Except for a period of time in which he was in prison, Murray has been fairly steadily employed. He has a prior conviction for second-degree murder stemming from a homicide in 1979, for which he received a sentence of fifteen years with five years suspended. Murray served approximately five years' incarceration before being paroled, and he was on parole at the time he committed these offenses. As a second felony offender, Murray faced a presumptive term of fifteen years for each of the present offenses. AS 12.55.125(i)(2).

Murray concedes that the court properly found four aggravators: (1) that his prior felony conviction was for a more serious offense, AS 12.55.155(c)(7); (2) that he was on parole at the time of the present charge, AS 12.55.155(c)(20); (3) that one of his victims, S.M., was particularly vulnerable because of her youth, AS 12.55.-155(c)(5); and (4) that the offense against S.M. was committed against a member of the same social unit where he was living, AS 12.55.155(c)(18). However, he disputes two other aggravators: (1) that he has a history of aggravated or repeated incidents of assaultive behavior, AS 12.55.155(c)(8); and (2) that his assault on S.M. was among the most serious within the definition of the offense. AS 12.55.155(c)(10). We conclude that the trial court did not err in finding any of the six aggravating factors. Murray complains that the trial court improperly found that he has a history of assaultive behavior. Murray has two prior convictions involving assaultive behavior: an assault and battery in 1971, and a second-degree murder conviction in 1979. Evi-

---

**5.** Murray notes that he was on parole for his previous murder charge at the time he committed these offenses. He fears that if his parole is revoked, he will be required to serve a substantial additional period of time. In addition, five years of his murder sentence were suspended and could be imposed if probation is revoked. By operation of law, any sentence imposed in this case would have to be consecutive to any time imposed on a petition to revoke on the murder case. AS 12.55.025(e); *Sanders v. State*, 718 P.2d 167, 168 (Alaska App.1986). It does not appear from the record in this case that Murray's probation has been revoked. Consequently, we cannot consider the effect of any additional time he will have to serve in determining whether the sentence in this case was excessive. Murray could, of course, appeal any sentence imposed on revocation of probation as excessive.

dence that a defendant has two or more prior convictions for assault satisfies AS 12.55.155(c)(8); therefore, the trial judge did not err in finding this aggravator.

 Murray also complains that the trial court improperly found that he was a worst offender. *See State v. Wortham,* 537 P.2d 1117, 1120 (Alaska 1975). S.M.'s testimony, corroborated by medical testimony, establishes that Murray repeatedly sexually assaulted her. While there was no physical violence, given S.M.'s age and the frequency of the assaults, the trial court did not err in finding the offense particularly serious. Given Murray's history, particularly the fact that he had previously been convicted of murder and had served almost five years of imprisonment and given the nature of these offenses, particularly the fact that there were two victims and that one of the victims was repeatedly assaulted, the trial court did not err in finding Murray to be a worst offender.

 The difficulty in this appeal is that Judge Johnstone imposed consecutive thirty-year sentences; thus, Murray must serve sixty years' imprisonment. When consecutive sentences are imposed in excess of the maximum penalty for the most serious offense, the trial court must find that the defendant must be isolated for the prescribed period in order to protect the public. *See Mutschler v. State,* 560 P.2d 377, 380 (Alaska 1977). Generally, we have not approved sentences of this length, even for the most aggravated cases of child sexual abuse. *See, e.g., Hancock v. State,* 741 P.2d 1210, 1214 n. 2 (Alaska App.1987). None of our past cases, however, involve individuals who had previously been convicted of murder, served a substantial sentence, were paroled, and then committed serious felonies.

 The trial court could have found that Murray abused each victim on multiple occasions. Even so, his conduct with each victim, viewed in isolation, would not justify a sentence in excess of ten to fifteen years for each conviction. *See Covington v. State,* 747 P.2d 550, 554 & n. 7 (Alaska App.1987); *Mosier v. State,* 747 P.2d 548,

549 (Alaska App.1987). It is only Murray's prior murder conviction which permitted the trial court to exceed the benchmark established in *Covington* and impose a total sentence in excess of fifteen years. The trial court's power to impose consecutive sentences for separate offenses does not, standing alone, authorize a sentence outside the benchmark. *Comegys v. State,* 747 P.2d 554, 558 (Alaska App.1987).

Where a defendant is convicted of multiple counts of serious felonies involving substantial violence or sexual assault, and the defendant has a felony record consisting of property crimes but no significant prior violent offenses, Alaska appellate courts have approved composite sentences, including consecutive increments, not exceeding thirty years. *Hintz v. State,* 627 P.2d 207, 210–11 (Alaska 1981); *Tookak v. State,* 648 P.2d 1018, 1023–24 (Alaska App.1982). Where a defendant is convicted of similar multiple offenses, but has a felony record involving substantial violence, we have approved a total composite sentence of up to forty years. *Larson v. State,* 688 P.2d 592, 600 (Alaska App.1984). We have also limited the sentence of a person who had an extensive felony record for nonviolent crimes and who was convicted of violent premeditated sexual assaults on three separate victims to a maximum composite term of forty years. *Nix v. State,* 653 P.2d 1093, 1101 (Alaska App.1982). Finally, in *Hancock,* 741 P.2d at 1215, the defendant had a substantial nonviolent criminal record, but also had demonstrated a history of violent behavior. Through constant physical abuse, the defendant had terrorized the victim, her sisters, and her mother for a substantial period of time. In addition, he engaged in numerous brutal sexual assaults on the victim and her sisters. We reduced the defendant's sentence to a maximum composite of forty years.

This is a particularly difficult case. In order to serve the legislative goals of avoiding disparity and ensuring reasonable uniformity in sentencing, we believe that Murray's total prison sentence should not exceed sixty years with ten suspended, which approximates the composite sentence

of fifty-three years approved in *Wortham v. State*, 689 P.2d 1133, 1143–45 (Alaska App.1984). Wortham received the longest composite sentence we have ever approved for criminal conduct less than murder. *But see Contreras v. State*, 767 P.2d 1169 (Alaska App., 1989). Wortham was convicted of a series of serious offenses and had five prior felony convictions. *Wortham*, 689 P.2d at 1143–44. His most serious offense was a kidnapping where the jury found that he intended to physically injure his victim and that he intentionally shot the victim, causing serious physical injuries. *Id.* at 1144. Under these circumstances, kidnapping is an unclassified felony with a maximum ninety-nine-year sentence. AS 12.55.125(b). In contrast, Murray was convicted of two counts of sexual abuse of a minor, also an unclassified felony, but with a thirty-year maximum term. AS 12.55.125(i).

When we established these guidelines, and as a result reduced some of these sentences, we were not rejecting the different trial judges' conclusions that these were particularly serious offenders guilty of particularly heinous conduct. *See Covington*, 747 P.2d at 554 n. 7. Rather, we were attempting to achieve the legislative goals of avoiding unreasonable disparity and ensuring reasonable uniformity in sentencing by requiring trial judges to consider similarly situated individuals sentenced for similar crimes before imposing sentence on even the most outrageous offenders.

Murray received a greater total sentence than the defendants' in *Hancock*, *Wortham*, *Larson*, *Hintz*, and *Tookak*. Such a sentence is clearly mistaken. Here, as we have noted, Murray was subject to a fifteen-year presumptive term for each of the two counts for which he was convicted. The sentencing court found six aggravating factors. Two relate to Murray's past convictions: that Murray had more than one prior conviction for a crime involving assault, and that his prior felony conviction was for a more serious crime than his current convictions. The first of these two factors is virtually subsumed by the second, because, apart from his second-degree murder conviction, Murray's only other as-saultive crime appears to be a 1971 misdemeanor assault conviction, which, standing alone, would be insignificant.

The four remaining aggravating factors relate directly to the circumstances surrounding Murray's commission of the current offenses: that Murray assaulted a particularly vulnerable victim, that his victim was a member of his household, that Murray's conduct was among the most serious within the definition of first-degree sexual abuse of a minor, and that he was on parole when he committed the offenses. All of these aggravating factors reflect the seriousness of Murray's conduct in engaging in the sexual abuses for which he was convicted and sentenced in this case.

■ The sentencing court was certainly entitled to enhance Murray's presumptive term in light of the four factors which related to the seriousness of his current conduct. In connection with these four aggravating factors, the court could properly consider that Murray had been convicted of offenses involving two victims, although it should be noted that three of these four factors applied only to Murray's assaults on S.M.

Our prior cases, however, establish that, while the overall seriousness of Murray's conduct in the present case would justify a significant increase in his presumptive sentence, reliance on these four aggravating factors would not justify imposing maximum consecutive terms totaling sixty years of unsuspended imprisonment. In extremely aggravated sexual assault and sexual abuse cases, we have consistently approved lengthy but not unlimited increases in the applicable presumptive terms. *See Lewis v. State*, 706 P.2d 715 (Alaska App. 1985); *Goolsby v. State*, 739 P.2d 788 (Alaska App.1987).

In *Lewis*, the defendant was convicted of numerous instances of sexual abuse involving children. The abuse occurred over a lengthy period of time and involved many children. The circumstances surrounding the assaults were particularly aggravated. On appeal, this court concluded that, despite the aggravating circumstances, Lewis

should be sentenced to a composite term not exceeding twenty years of unsuspended imprisonment (twenty-five years with five years suspended). Lewis was a first felony offender and was subject to an eight-year presumptive term for his most serious offense. The composite unsuspended term of twenty years that we approved amounted to an enhancement of twelve years in light of the aggravated nature of Lewis' conduct.

In *Goolsby*, the defendant was convicted of forcibly raping three different women on three separate occasions. Goolsby used a knife in committing his offenses. This court found Goolsby's crimes to be exceptionally aggravated and approved composite sentences totaling twenty-five years of unsuspended imprisonment (thirty-seven years with twelve years suspended). Goolsby was also a first felony offender but was subject to a ten-year presumptive term because he used a dangerous instrument in committing his assaults. The aggravated nature of Goolsby's conduct thus resulted in a total unsuspended term that was fifteen years longer than the applicable presumptive term for Goolsby's most serious crime. *See also Howell v. State*, 758 P.2d 103 (Alaska App.1988) (reducing thirty-eight-year term to twenty-five years with five years suspended for nominal first offender convicted of multiple counts of serious child sexual abuse).

The aggravated circumstances surrounding Murray's current offenses are comparable to, and certainly no worse than, the aggravating circumstances involved in *Lewis* and *Goolsby*. All of these offenses deal with particularly aggravated instances of sexual assault involving multiple incidents and multiple victims. Although Lewis and Goolsby were both first felony offenders, whereas Murray is a second felony offender, there can be no logical basis for concluding that the similarly aggravated conduct in all three cases should result in significantly disparate sentencing increases. *Lewis* and *Goolsby* thus indicate that the four aggravating factors relating to the seriousness of Murray's conduct should justify an increase of roughly twelve to fifteen years over the fifteen year pre-

sumptive term that applies to Murray's case. A fifteen-year enhancement for Murray's fifteen-year presumptive term would yield an adjusted term of thirty years. Any additional enhancement of Murray's presumptive term could not be justified by his aggravated conduct in the current offenses, but only by the seriousness of his past conduct.

The fact that Murray has a prior felony conviction is, of course, already taken into account in the fifteen-year presumptive term that applies to him as a second felony offender, which represents a seven-year increase over the applicable eight-year presumptive term for a first felony offender. Increasing Murray's composite term substantially beyond thirty years of unsuspended imprisonment would thus seem to be justifiable, if at all, only by reliance on the particularly serious nature of Murray's prior conviction for second-degree murder.

We recognize that the process of sentencing is not an exact science. Even with the intricacies of presumptive sentencing, appropriate sentences cannot be determined by mechanistic reliance on mathematical formulas. The foregoing discussion is not meant to suggest otherwise. Rather, it is meant only to illustrate, by rough approximation, the maximum range of sentences that would likely be appropriate but for the fact that Murray's prior felony conviction was for a particularly serious crime. By taking the tentative and admittedly approximate figure of thirty years as a starting point for analysis, it becomes possible to isolate the crucial question in this case: does the fact that Murray's prior conviction was for a particularly serious felony justify an additional enhancement of his presumptive term by thirty years of unsuspended imprisonment? We must answer this question in the negative.

The seriousness of Murray's prior crime is specifically addressed in the aggravating factor provided for under AS 12.55.-155(c)(7). This aggravating factor permits the sentencing court to enhance the applicable presumptive term when the defendant has previously been convicted of a

more serious felony. This aggravating factor unquestionably justified enhancement of Murray's composite sentence beyond the thirty-year term that would have been appropriate had Murray's prior conviction been for a less serious felony. Yet Murray's prior conviction for a more serious felony is but one aggravating factor among several. There is nothing in the legislative history of the presumptive sentencing statutes to suggest that the legislature intended to give this factor overriding prominence or to make it more significant than any of the other statutory factors included in AS 12.55.155(c).

To rely on the seriousness of Murray's prior conviction as a justification for virtually doubling the adjusted term that would otherwise be appropriate simply places inordinate and disproportionate weight on a single statutory aggravating factor. Our holding in *Juneby v. State*, 641 P.2d 823 (Alaska App.1982), *modified in part*, 665 P.2d 30 (Alaska App.1983), is relevant in this regard.

> If sentencing courts were permitted, under the presumptive sentencing scheme, to deviate routinely and substantially from the presumptive terms prescribed by law, the fundamental purposes of eliminating disparity and establishing reasonable uniformity in sentencing would be completely undermined. Unless the provisions of AS 12.55.155 are adhered to strictly, and unless a measured and restrained approach is taken in the adjustment of presumptive sentences for both aggravating and mitigating factors, then the prospect of attaining the statutory goal of uniform treatment for similarly situated offenders would quickly be eroded, the potential for irrational disparity in sentencing would threaten to become reality, and the revised code's carefully fashioned system of escalating penalties for repeat offenders would be rendered utterly ineffective.

*Juneby,* 641 P.2d at 833.

We again stress that we do not seek to diminish the serious and aggravated nature of Murray's current and past felony convictions. The seriousness of the offenses, however, cannot justify total abandonment of the need for uniformity and for elimination of disparity—the predominant goals embodied in our carefully structured presumptive sentencing scheme. Accordingly, we conclude that a composite term of sixty years in the present case is clearly mistaken.

More difficult is the question, "What is the maximum composite sentence Murray could receive?" This question turns on the proper category in which to place Murray. After careful consideration, we conclude, as noted above, that Murray's record and offense most closely approximate the defendant's in *Wortham.* Although Murray has only one prior felony conviction, while Wortham had five, Murray's prior offense was murder. Wortham's most serious offense was kidnapping, with a maximum ninety-nine-year sentence. The maximum sentence for Murray's most serious offense was thirty years. In our view, a sentence for Murray in excess of sixty years with ten years suspended is clearly mistaken. *McClain v. State,* 519 P.2d 811, 813–14 (Alaska 1974).[6]

**6.** The discussion of sentencing in the opinion reflects the views of a majority of the members of this court. I agree with everything in this opinion except the decision to reduce Murray's sixty-year sentence to sixty years with ten years suspended in order to approximate Wortham's fifty-three-year sentence. Application of the clearly mistaken standard requires that we identify a permissible sentencing range for the offender in light of his or her background and offense. *McClain,* 519 P.2d at 813. In order to develop the permissible range, we must consider sentences imposed on similar individuals committing similar crimes. *Comegys,* 747 P.2d at 557. I agree with the majority that the difficult question in this case is finding an appropri-

ate category for Murray. One reasonable judge might find Murray's record and offense comparable to that of the defendants in *Larson* or *Hancock,* and sentence accordingly. Another reasonable judge might group Murray with the defendant in *Wortham,* as the majority does. However, it seems to me that a reasonable judge could rely on the fact that, of the offenders under consideration, only Murray had previously been convicted of murder, served five years, and was on parole at the time he committed the unclassified felonies under consideration. In my view, a judge could conclude that Murray's situation was unique, entitling him to a category of his own. I am not able to say that Judge

The judgment of the superior court is AFFIRMED. The sentence is VACATED and this case is REMANDED for imposition of a total sentence not to exceed sixty years with ten years suspended. No further sentencing hearing need be held unless the trial court, in its absolute discretion, elects to hold one.

Johnstone was clearly mistaken in reaching such a conlcusion and in imposing a composite sentence of sixty years. I therefore dissent from the decision to reduce Murray's sentence.